**John Lloyd SMELCER,**

v.

**The UNITED STATES.**

No. Cong. 17864.

United States Court of Claims.

Jan. 11, 1955.

Howard F. Jarvis, Knoxville, Tenn., for plaintiff.

John R. Franklin, Washington, D. C., with whom was Asst. Atty. Gen., Warren E. Burger, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

JONES, Chief Judge.

This is one of the rare cases in which there is no legal liability, but in which the ends of justice require that some

payment be made, since the defendant received the benefits of the work, which was manifestly performed at a loss.

The facts as developed at a full hearing are as follows:

1. The plaintiff, John Lloyd Smelcer, is a resident of Midway, Greene County, Tennessee, and prior to World War II was operating under the firm name of Warrensburg Foundry, a business confined to the casting of small parts of brass and iron for farmers and small industries located in the vicinity of Midway and to the operation of a small machine shop. The Warrensburg Foundry was located on the plaintiff's father's farm and was established about 1932. In 1942 the machine shop was worth about $10,000.

2. Senate Resolution 335, 81st Congress, 2d Session, referring this claim, reads as follows:

"*Resolved,* That the bill (H. R. 5250) entitled "For the relief of J. L. Smelcer", now pending in the Senate, together with all the accompanying papers, is hereby referred to the Court of Claims; and the court shall proceed with the same in accordance with the provisions of sections 1492 and 2509 of title 28 of the United States Code and report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States and the amount, if any, legally or equitably due from the United States to the claimant: *Provided, however,* That the passage of this resolution shall not be construed as an inference of liability on the part of the Government of the United States."

H. R. 5250, 81st Congress, 2d Session, referred to in the above resolution reads as follows:

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress Assembled,* That the Secretary of the Treasury is hereby authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to J. L. Smelcer, doing business as the Warrensburg Foundry, Midway, Tennessee, the sum of $49,875.42. Payment of such sum shall be in full settlement of all claims of the said J. L. Smelcer against the United States arising by reason of losses sustained by him when, at the insistence of contract representatives of the Government and officials of the Smaller War Plants Corporation, and upon their assurance that he would be reimbursed for any losses occasioned thereby, he entered into the production of base closing plugs for fragmentation bombs: *Provided,* That no part of the amount appropriated in this Act in excess of 10 per centum thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in connection with this claim, and the same shall be unlawful, any contract to the contrary notwithstanding. Any person violating the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $1,000."

Passed the House of Representatives May 2, 1950.

3. Plaintiff received a subcontract from the Walters' Machine Shop dated December 1, 1943, for 125,000 base-closing plugs, complete with set screws inserted and zinc plating, at a unit price of $0.23 each, deliveries to be made over a five-month period from December 1943 to April 1944. It appears further that the Walters' Machine Shop, Morristown, Tennessee, had a subcontract with the Alabama Pipe Company at Anniston, Alabama.

The base-closing plug was a small machined fitting which was intended to become a part of a 22-pound general

purpose fragmentation bomb for the U. S. Army Ordnance Department.

4. As of June 12, 1944, the Walters' Machine Shop again subcontracted to the plaintiff an order for 75,000 base-closing plugs at a unit price of $0.23 each, deliveries to be made 25,000 per month beginning July 1944. From the purchase order itself it would appear that this order related to a different Government contract from the previous order but appears to have concerned the same item destined for the same purpose.

5. By purchase order of October 16, 1944, the Walters' Machine Shop ordered from the plaintiff 50,000 base-closing plugs at a unit price of $0.23 each, to be shipped in the months of October, November, and December.

6. By purchase order of November 24, 1944, the Walters' Machine Shop ordered from the plaintiff 60,000 base-closing plugs at a price of $0.23 each, delivery to be made 20,000 per month beginning January 1945.

7. The above four purchase orders or subcontracts were all that the plaintiff had with reference to the base-closing plugs.

8. In addition, the plaintiff performed wartime work for the Knoxville Iron Co., Knoxville, Tennessee and the Alabama Pipe Co., Anniston, Alabama. Plaintiff also held a small contract with the United States Maritime Commission. These contracts were not for the base-closing plugs.

9. Plaintiff performed all of this work satisfactorily and has been paid the contract price therefor. Such work was performed over a period of 38 months, beginning in April 1942.

10. While the reference set out hereinabove in finding 2 involves only losses in the production of base-closing plugs for fragmentation bombs, plaintiff's claim in the petition in this case is for his losses on all war contracts. It is impossible from his records, or from the proof herein, to segregate plaintiff's costs in the production of base-closing plugs from his costs on all war work.

In fact, plaintiff performed during the period involved, private work for which he received $9,398.29. Plaintiff's costs on this private work cannot be segregated accurately, and his costs have accordingly been prorated on the basis of his receipts.

If a similar allocation of costs to base-closing plugs and other war works is desired, the plaintiff's receipts therefrom were respectively $74,175.15 and $29,384.04.

11. Plaintiff was not highly educated, nor was he a shrewd businessman. However, he had five cousins in the military service and was anxious to get into war work and assist in the war effort. During the performance of such war work, plaintiff borrowed heavily from his father and others, and at the end of the war had become indebted to his father in the sum of $46,000, which sum he still owes.

12. The officials of the Smaller War Plants Corporation, and particularly Stewart S. Neff, district manager in Knoxville, Tennessee, were anxious to enlist in the war effort as many small businesses as possible. Mr. Neff assisted plaintiff in securing contracts for war work and assured him that the Government would not let him lose money on them. He told him that he would not be guaranteed a profit, but would not be allowed to incur a loss. Such advice was also given by Army and Navy officers, in a liaison capacity with the Smaller War Plants Corporation, who visited plaintiff's machine shop. It does not appear that either Mr. Neff or any of the other officers who talked to plaintiff had any authority to guarantee him on behalf of the defendant against losses on his Government contracts. But it does appear that plaintiff believed that they had such authority and relied thereon.

13. Under the first purchase order or subcontract of December 1, 1943, plaintiff appeared to be making a profit and he has so conceded. However, by 1945 the plaintiff had begun to feel the effects of increased costs of performance.

Sometime in the year 1945 and prior to June of that year, plaintiff talked with an official of the Army Ordnance District at Birmingham, Alabama, with reference to possible relief on his subcontracts for the base-closing plugs for that department.

Plaintiff, however, did not file a claim or request for relief during the war nor did he file one with the Department of the Army after the war.

It appears that plaintiff filed a written claim with the Walters' Machine Shop which at the time of the trial of this case was involved in separate litigation with plaintiff. Plaintiff may have also filed a termination claim with the Walters' Machine Shop in connection with plaintiff's purchase order of November 24, 1944, which had been terminated June 29, 1945. Plaintiff received payment in connection with this termination claim.

14. At the time plaintiff accepted the order of June 12, 1944, the second purchase order from Walters, plaintiff asked for a higher price but the order was awarded at the figure $0.23 each. Walters apparently informed plaintiff that he would take the question of an adjustment of the purchase price into consideration and would make further representation to the prime contractor. Whether this was ever done has not been shown.

Toward the end of the war plaintiff went to see Mr. Neff to complain that he was losing money. Apparently plaintiff had closed his plant at one time. Plaintiff appears to have closed down his business because of his feeling that he was losing money, and also on account of the requirements of the wage and hour laws which Government officials had informed him he would have to observe. Plaintiff had not been paying the men overtime.

15. Plaintiff says that his acceptance of the second purchase order was made with the knowledge that he was losing money at that time, but that he relied upon certain assurances received from the Smaller War Plants Corporation to take care of the matter after the war.

16. Plaintiff asked Smaller War Plants how he might obtain Government work. In addition, Smaller War Plants Corporation went into the contracts and attempted to assist plaintiff in making his bids and also warned the contractor to be sure of his costs. Mr. Neff's connection with Smaller War Plants ended shortly after June 1944.

Walters had the right under his general contract to negotiate with any subcontractor he desired.

17. The Smaller War Plants Corporation assisted the plaintiff in locating war work and in locating and leasing equipment for his machine shop. Plaintiff leased several pieces of equipment from the Smaller War Plants Corporation. Because he fell behind in rentals, the Reconstruction Finance Corporation filed a suit against plaintiff for the rental of its lathes. His answer filed in this action showed that plaintiff entered into an agreement and lease May 12, 1944, for the rental of one lathe, later supplemented to cover two additional ones. Plaintiff appears to have been under the impression the rental would be 1½ percent per year on the appraisal value of the lathes. However, as he later found out, the rental was 1½ percent per month. Rental was paid up to October 1945 although the lathes were not used after August 16, 1945. In September 1945, plaintiff advised Smaller War Plants Corporation that he had no further use for the lathes but was interested in purchasing them provided he could secure a loan to cover the purchase price.

18. There was no directive to the Smaller War Plants Corporation by which they could guarantee smaller manufacturers against losses under their contracts. Mr. Neff did not make a guarantee in this sense. However, he did recognize an obligation on his part to assist plaintiff in the preparation of his bid for this work. He was ambitious to enlist as many small businesses as possible in the war effort, and he may

have oversold the plaintiff on being indemnified against losses.

19. The ascertainment of the amount of plaintiff's loss in the performance of his war contracts presents considerable difficulty. As stated above, the plaintiff was not a businessman, nor familiar with methods of accounting. His job records were scanty and fragmentary, consisting largely of canceled checks, bank statements, some invoices, and payroll records covering a part of the performance period. These records have been subjected to examination by accountants for both parties and their results are considerably divergent.

20. The accountant for neither party has been able to account for the loss in the conduct of plaintiff's business of any such amount as the $46,000 borrowed from plaintiff's father. During the 38 months during which the performance of the war contracts was in progress, plaintiff drew from the business no salary or allowances. It must have cost him and his family something to live during this period, and the use of a part of the $46,000 is undoubtedly accounted for in this way.

21. Plaintiff's accountant arrived at a loss on the war contracts of $15,727.02 before any salary allowances to plaintiff and his wife. The defendant's accountant, on the other hand, finds a profit of $21,060.87. The difference is accounted for in several ways. Plaintiff purchased some $17,682.75 worth of equipment for the performance of the war work. Plaintiff's accountant has charged this entire cost as an expense. Defendant's accountant, on the other hand, has found only $6,148.00, being chiefly depreciation at 20 percent a year on such equipment for 38 months. Since completion of his war work plaintiff has had no further need for such equipment.

22. A further difference in the results arrived at is due to the fragmentary nature of plaintiff's records, and the difficulty, from an accounting standpoint, of attributing certain expenditures to definite objectives. Throughout the record, the plaintiff has amply demonstrated not only his patriotism but his inherent honesty, and consequently his testimony regarding such disputed items has been accepted.

23. The financial results of plaintiff's performance of war work are set out below:

Plaintiff's revised claim, as shown by his suggested findings of fact, sets out costs of all work during the period of war contract performance of $129,165.99. The difference between the sums for new equipment referred to in finding 21 is $11,534.75.

Plaintiff performed during said period of 38 months, private work for which he received $9,398.29. Plaintiff believes he performed such work at a loss, but at a loss smaller than his loss on war work. It is impossible from plaintiff's records to segregate the costs on such private work, but if its cost was comparable to the cost of the war work, it amounted to $9,757.69.

Deducting these two items from plaintiff's stated costs therefore leaves the sum of $107,873.55 as the cost of performance of war work for which plaintiff received the sum of $103,900.19, or a loss thereon of $3,973.36.

Included in the latter sum are certain items which the defendant's accountant eliminated, as follows:

| | |
|---|---|
| Interest on note | $1,621.94 |
| Interest on notes | 530.65 |
| Dues and subscriptions | 370.00 |
| Accounting fees | 187.00 |
| Total | 2,709.59 |

These are items which would not have been incurred by the plaintiff but for the war work.

As stated above, neither plaintiff nor his wife drew any compensation for their services. Plaintiff worked very hard on the job, devoting from 12 to 16 hours a day, 7 days a week thereto. He placed a cot in the shop and slept there so as to be immediately available at all times. Plaintiff's wife devoted

on an average of 4 to 6 hours a day to the job.

If plaintiff and his wife are to be compensated for their work, $350 per month to the plaintiff and $100 per month to the plaintiff's wife, for the 38 months of war contract performance seem reasonable.

24. Whether or not the defendant may be indebted in law or equity to the plaintiff in any amount, a payment to him and his wife of $20,000 would not be inappropriate as a concrete expression of defendant's appreciation for his patriotism and services.

25. In addition, some relief might be accorded plaintiff for the undepreciated cost of the equipment purchased specially for performance of war contracts and no longer of any use to plaintiff, amounting to $11,537.75, and having scrap value of only $2,000.

26. Perhaps plaintiff's patriotism and honesty, and the plight to which they have brought him, are best shown by his own words found in the colloquy on pages 164 and 165 of Vol. I of the testimony, as follows:

"254. Q. Is there anything else you would like to tell Mr. Vance about this that I haven't asked you about? A. I have told you about all I know to tell, but as I said before, I relied on the honesty of our Government Agency, and it seems that somebody slipped somewhere because I didn't have no authority. I didn't know at the time that Mr. Neff or anyone connected with it didn't have any right to guarantee me anything.

"255. Q. As far as you know they did have? A. Yes, and on the other hand I expect I would have went ahead and made the parts if it killed me because I had five cousins across the water, and I don't know whether they would have ever come back or not but for some fellows like myself, but anyway, the war is over and I have not been too good a businessman."

While the facts do not bring the case strictly within the Lucas Act, it is substantially within the purview of that statute, and falls within the purposes which Congress evidently had in the enactment of that measure.

Plaintiff worked seven days a week, 12 or more hours per day. He produced much-needed supplies on time.

While the losses were no doubt greater, there is satisfactory evidence that they were at least $3,973.36. Since he received nothing for the 38 months' faithful work of himself and his wife, it is manifest that some compensation should be allowed on that account.

We think that in equity, good conscience and fair dealing plaintiff should be paid the sum of $20,000.

We recommend to the Congress that provision be made for such payment.

We think it would also be proper, in addition, that plaintiff be allowed a part or all of the $9,537.75 loss which he sustained on the machinery which was useful to him only during the war period.

LARAMORE, MADDEN, WHITAKER, and LITTLETON, JJ., concur.